UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | | |
|---|---|---|---|
| UNITED STATES OF AMERICA | : | Case Nos. | 3:06-CV-193 (AVC) |
| | : | | 3:03-CR-22 (AVC) |
| v. | : | | 3:03-CR-272 (AVC) |
| | : | | |
| FRANK S. CHUANG | : | November 13, 2006 | |

### UNITED STATES' RESPONSE TO DEFENDANT'S POST-HEARING BRIEF

The defendant, Frank Chuang, was prosecuted for defrauding the federal and state Departments of Transportation, and for cheating on his federal income taxes over a period of years. After lengthy negotiations between the Government and his attorneys, the defendant eventually pled guilty, and reached a global civil and criminal settlement whereby he would pay over $8 million in restitution, fines, penalties, and other payments. While liquidating his assets in advance of sentencing, the defendant happened to sell one of his properties to a person who was under investigation in another jurisdiction. The Government learned of this from independent sources, and inquired of Chuang's counsel as to whether he was in a position to usefully cooperate with the Government.

As is standard, the Government refused to consider entering into a cooperation agreement until after it had received a proffer of the defendant's information – first through his attorney, and then directly from the prospective witness (here, primarily the defendant's wife). Once the Government evaluated that information, it decided that it was not particularly useful; it was essentially cumulative of the same basic information that the Government had independently obtained in the other jurisdiction, and it was never put to use. Accordingly, the Government chose not to enter into a cooperation agreement or to file a § 5K1.1 motion. Nevertheless, the

Government agreed not to object to defense counsel's seeking a bottom-of-the-range sentence based on these attempts at cooperation. At a post-*Booker* sentencing, this Court agreed that the information warranted some leniency, and expressly stated that it was imposing a sentence at the lowest end of the applicable guideline range as a result.

In this § 2255 action, the defendant unrealistically faults his attorneys for failing to do more. In making that claim, the defendant dramatically misunderstands how cooperation agreements are negotiated in this District. He seems to be laboring under the misapprehension that a defense lawyer can somehow bludgeon the Government into signing a cooperation agreement at the time of a plea, even without having anything to cooperate about. He also misses the point that the Government enters into cooperation agreements only *after* considering a proffer of information, and determining that such an agreement is warranted.

As explained in detail below, the defendant's lawyers acted as vigorously as possible in seeking sentencing credit for his cooperation, and his claims must fail for a variety of reasons.

## I.    Procedural History

On February 7, 2006, the defendant Frank S. Chuang filed a Motion to Vacate, Set Aside, or Correct Sentence Pursuant to Title 28, United States Code, Section 2255 [doc. #1], together with a supporting memorandum [doc. #2], and the Clerk's Office assigned Case No. 3:06-CV-193 (AVC). He claimed that his trial counsel were constitutionally ineffective for three reasons: (1) that they failed to communicate a favorable plea offer, which would have allowed him to serve only 27 months in prison; (2) that counsel failed to negotiate a cooperation agreement with the Government; and (3) that counsel failed to develop a claim for a downward departure based on extraordinary acceptance of responsibility. On February 21, 2006, the United States filed its

2

response [doc. #7], asking that the Court reject each of those claims.  In support, the United

States provided affidavits from two prosecutors, attesting *inter alia* that no favorable plea offer

had ever been made, and that the defendant had not, in fact, provided substantial assistance to the

United States in any investigation or prosecution.  On March 24, 2006, the defendant filed a

pleading styled a "traverse" [doc. #11], which made no mention of claim (1).

On July 18, 2006, this Court issued an eight-page written ruling.  The Court began by

noting that Chuang had withdrawn claim (1), regarding the supposed plea offer.  With respect to

claim (2), regarding the defendant's claim that his lawyers were ineffective for failing to

negotiate a cooperation agreement, the Court held that

> [g]iven the dearth of factual allegations supporting Chuang's assertion that his
> cooperation constituted "substantial assistance" and the affidavits that state the
> opposite, the court cannot find that Chuang's assistance was substantial.
> Therefore, even if the court should accept that a failure to include the "contractual
> provision" fell below an objective standard of reasonableness, the court cannot
> find that there is a reasonable probability that, but for counsel's unprofessional
> performance, the outcome of the proceeding would have been different.

Ruling at 5.  With respect to claim (3), that his attorneys were ineffective for failing to argue

strenuously enough at sentencing for a departure based on extraordinary acceptance of

responsibility, the Court held that the defendant's valid waiver of appellate rights barred this

challenge to his sentence.  *See* Ruling at 5 (quoting *United States v. Salcido-Contreras*, 990 F.2d

51, 53 (2d Cir. 1993) ("In no circumstance, however, may a defendant, who has secured the

benefits of a plea agreement and knowingly and voluntarily waived the right to appeal a certain

sentence, then appeal the merits of a sentence conforming to the agreement. Such a remedy

would render the plea bargaining process and the resulting agreement meaningless.")).  The

Court nevertheless ordered an evidentiary hearing, to permit the defendant an opportunity to

develop his argument on claim (2).

That hearing was held on September 11, 2006.  At that hearing, the United States offered, with the consent of defense counsel, a lengthy and unchallenged proffer about the nature and value of the attempts by the defendant – or, more precisely, by his wife – to cooperate with the government in an effort to obtain a sentencing reduction.  Among other things, the United States represented that the defendant had not been of substantial assistance to the Government in any other investigation or prosecution.  The defendant called four witnesses: Attorneys Austin McGuigan and James Wade, who represented the defendant; Attorney Hugh Keefe, who represented the defendant's wife, Lily Chuang; and Lily Chuang herself.

On October 28, 2006, the defendant filed a post-hearing brief [doc. #23], reiterating his claim that his lawyers were ineffective for failing to negotiate a cooperation agreement.  The defendant has not challenged the accuracy of the Government's representations about the use to which his information was put (or, more to the point, *not* put).  Nor has he presented any contrary factual allegations – either at the hearing or in his latest response – that the information provided by him (or, more accurately, by his wife) in fact was of substantial assistance to the United States.  The only information he provided on that score was testimony that his wife had spent a large number of hours assembling documents in an effort to cooperate.

## II.   <u>Statement of Facts</u>

Based on the evidence provided at the hearing on September 11, 2006, the following facts appear to be undisputed.  References to the transcript of that hearing will be designated "Tr. __."

### A.   <u>Events Predating the Defendant's Guilty Plea</u>

Attorney McGuigan testified that he represented the defendant as well as his companies

in this criminal matter, Tr. 20, served as principal counsel, Tr. 21, and negotiated "endlessly

about this case" with the prosecutors regarding a plea agreement.  Tr. 20.  Attorney McGuigan

had significant experience in criminal practice generally, and in negotiating cooperation

agreements specifically.  He testified that he had significant experience in the field of criminal

law, Tr. 19, including thirteen years as a prosecutor, of which seven years were spent serving as

the Chief State's Attorney for the State of Connecticut, Tr. 49.  As a prosecutor, he had

"negotiated more than one proffer agreement on the other side of the table."  Tr. 49.  As a

defense attorney, he had represented 15 to 20 federal criminal defendants, Tr. 20, and negotiated

cooperation agreements in most of them, Tr. 37, 38.

Attorney McGuigan explained that he had vigorously explored – both with his client and

the prosecutors – the possibility of cooperation with the U.S. Attorney's office:

> I approached [the prosecutor] on every conceivable way that I could
> possibly lower this sentence including cooperation.  I explored with my client also
> the possibility that he could in fact cooperate on newer investigations into the
> administration at that time.  And I felt that it was possible that we might have
> some information there.  *But we had no information that I was aware of after
> extensive interviews that might allow me to enter into a cooperation 5K contract
> with the government.*
> So, at the end of the day, we negotiated this plea agreement.  *There is no
> cooperation agreement because at the time it was negotiated there was no
> cooperation anticipated.*

Tr. 23 (emphasis added); *see also* Tr. 9 (government represents to the Court that Attorneys

McGuigan and Wade had engaged in a number of conversations with the prosecutors about

whether there were any way to reduce the potential sentence for the defendant, including whether

there was any potential for cooperation).  He did not "make a demand" to the Government about

entering into a cooperation agreement prior to entry of the plea because "I obviously wanted to

cooperate, but *I didn't have anything to offer Mr. Nardini or anybody else in the Government to get them to contemplate a 5K motion*.  It was simply nothing that I could think of at the time that would even get me on that road."  Tr. 23 (emphasis added)

On September 24, 2003, the defendant entered a plea of guilty to two false claims charges, and one tax charge.  At the plea hearing, the Court accepted a written plea agreement [doc. #31], which contained an express waiver of his right to challenge his sentence on appeal or in a § 2255 proceeding, provided it was no greater than a specified level.  *See* Plea Agreement at 7.  (The Government respectfully refers the Court to pages 8-9 of its Response [doc. #7] for the full text of the waiver, as well as the relevant portions of the plea colloquy.).

**B.    Events Post-Dating the Defendant's Guilty Plea**

Some time after the defendant's plea, prosecutors in the District of Connecticut learned that federal authorities in another jurisdiction were investigating certain misconduct.  Tr. at 10. Attorney McGuigan recalled that it was in approximately May 2004 that he received a call from a prosecutor in the U.S. Attorney's Office about possibly cooperating in connection with a "potential case involving the sale of property" owned by the Chuangs.  Tr. 24; *see also* Tr. 10.  It involved a real estate closing which the defendant's wife had handled, Tr. 25, and in which the defendant had had "no real connection" with the people involved, Tr. 26.

Attorney McGuigan was "more than a little worried" by this development, since he was concerned that the defendant "might end up in another case," Tr. 24, given that the real estate closing had not been, as he tactfully put it, "plain vanilla," Tr. 26.  Attorney McGuigan was working from the baseline recognition that he "did not have the greatest negotiating hand in the first instance."  Tr. 24-25. Attorney Wade similarly recalled that the underlying case against the

6

defendant was very strong, and that "the effort on his behalf was primarily in mitigation of punishment." Tr. 66. That reality led Attorney Wade to focus his efforts on obtaining psychiatric evidence to present at sentencing, Tr. 65-66; on cutting through bureaucratic paperwork associated with the fraudulent billing, Tr. 66-67; and on trying to keep the defendant's corporation in business for his son after sentencing, Tr. 67-68. Attorney McGuigan was understandably "concerned about the Government investigating the sale of property involving Mr. Chuang and the potential catastrophic effects that could have on whatever else we had already negotiated." Tr. 24-25. He also "felt that this case needed immediate intermediation in order to keep ourselves from potentially becoming a target." Tr. 34. The most immediate concern for Attorney McGuigan, therefore, was preventing his client from being exposed to further criminal prosecution in connection with the real estate closing, and from losing the benefits that had already been negotiated as part of the plea agreement.

In pursuing cooperation in this case, Attorney McGuigan followed the same procedure he always follows. The first step was to determine whether he had anything of value to trade, and he considered himself "fairly good at making that analysis having been on the other side of this business for a long time." Tr. 38. If he has something to offer, there will be an attorney proffer. Tr. 39. Then, if the Government has some interest based on the attorney proffer, it will ask for a proffer from the defendant, which is done pursuant to a separate document known as a proffer agreement. Tr. 39. Then, "if the proffer session with the defendant leads to information that warrants the entry into a cooperation agreement, that's when the separate document, the cooperation agreement, is signed by the parties and filed with the Court under seal." Tr. 39-40; *see also* Tr. 38. Once a cooperation agreement is entered into, "the party does a variety of things

for the Government depending on the case," such as testifying before a grand jury or at trial, or making consensual recordings.  Tr. 40.

In keeping with this standard procedure, Attorney McGuigan began with an attorney proffer.  In order to "further the idea that we would not be targets of this investigation," Attorney McGuigan met with AUSA Anastasia Enos, discussed the case, and concluded that it offered the "potential for negotiating with Mr. Nardini and U.S. Attorney's Office cooperation." Tr. 25.  As a result of his discussions with the Government, Attorney McGuigan was informed that his clients were not "targets" of the case, Tr. 28, and the Government later made a similar representation to Attorney Keefe that his client Lily Chuang was not a target, Tr. 56. Nevertheless, Attorney McGuigan remained "concerned about the factual issues in the case and how they might play out for us."  Tr. 25.

Again in conformity with usual practice, Attorney McGuigan brought the defendant to a proffer with the Government, Tr. 27, 28, "but it became evident that he was not the person with the most information about the transaction.  His was secondhand," and so the Government wanted to hear directly what the defendant's wife had to say.  Tr. 27.  The Government subsequently met twice with Lily Chuang, who was accompanied on each occasion by Attorney Keefe or his partner.  Tr. 53 (Keefe).  In connection with these meetings, the Government delivered two subpoenas to Lily Chuang for documents related to the real estate closing, and she produced a number of documents in response.  Tr. 57-59 (Keefe); 72-73 (Lily Chuang).  Attorney McGuigan remained concerned that much of the information the Chuangs were providing could also be obtained by subpoena to the closing attorney involved in the transaction.  Tr. 20.  Because the Government could get much of this information from an alternate source, Attorney

8

McGuigan was concerned that the Chuangs' information "wasn't exactly negotiable currency" for obtaining a cooperation agreement.  Tr. 30.

Ultimately, the Government chose not to follow up with the Chuangs on the information they had provided.  Again, Attorney McGuigan emphasized that he "had no negotiating position" at this point, and acknowledged that he "couldn't control whether or not the Government would give me a contract."  Tr. 27.  "And so I asked.  And was told that they would consider Lily's cooperation to be attributable to Mr. Chuang.  But they were not going to provide me with a formal 5K at that point.  That's a 5K agreement, or a cooperation agreement."  Tr. 27.  Again, he emphasized: "I did not have a very good negotiating position because this was an interesting closing."  Tr. 28.  Attorney McGuigan believed that the Government only seemed "a little interested" in going forward with cooperation after their first proffer, Tr. 29, but hoped that "if they would go forward we would be able to negotiate a formal agreement . . . ."  Tr. 29.  Despite his hopes, "after Mrs. Chuang met with the Government, we heard nothing for a long time.  I asked Mr. Nardini on a number of occasions where we were and he basically told me we weren't, he wasn't sure it was going to be substantial assistance and he didn't know, and finally he told me that the Government was not going to use the information that had been provided."  Tr. 29; *see also* Tr. 31 ("Again, I had asked Mr. Nardini for a cooperation agreement and he was basically going in a wait mode . . . .  But quite frankly we did not have a hand that was simple to play because these documents are available from other persons besides Mr. Chuang.").  Later, when Attorney McGuigan informed the Government "on a number of occasions" about the fact that the buyers of the property had contacted Mrs. Chuang, and suggested the "possibility we might be able to [have] further contact with them," the Government "seemed to have no more

9

interest." Tr. 32; *see also* Tr. 76-77 (Lily Chuang testifies that her attorney informed the U.S. Attorney's Office over a year ago that target phoned her, but Government has never contacted her or her lawyers to pursue that issue). Summarizing his efforts, Attorney McGuigan testified that he did everything he could have done in this case, and didn't know what else he could have done to pressure the Government into signing a cooperation agreement: ". . . I certainly couldn't make them do it and I didn't know how tradeable the information I had was and whether its value was going to hold up." Tr. 46.

At the evidentiary hearing, the Government represented that it never used the information provided by the Chuangs. Tr. 9-10. It did not bring charges based on that information. Tr. 9-10. It did not call the defendant's wife as a witness in any court proceeding. Tr. 10-11. The Government never obtained search warrants based on this information. Tr. 11. The information provided was essentially cumulative of the basic information that federal authorities had already obtained in the other jurisdiction. Tr. 11. Using information that had been collected independently of the Chuangs, federal authorities had obtained a criminal forfeiture count in an indictment in the other jurisdiction, and the property in question was ultimately forfeited. Tr. 11. Because this forfeiture had occurred independently of the information provided by the Chuangs, the Government did not regard their information to have been of "substantial assistance." Tr. 11.

None of the defense attorneys offered any contrary testimony, to the effect that the Chuangs' information had, in fact, been of "substantial assistance" to the Government. Attorney McGuigan agreed that when a cooperation agreement is entered into, a party may testify in the grand jury, a trial, or make consensual recordings, but none of those things happened here. Tr. 39-40, 42. Attorney Keefe testified that he knew nothing about the target of the Government's

other investigation other than his involvement in the closing, and he agreed that he had no

"personal knowledge as to what use was made of the information provided" by Lily Chuang.  Tr.

63.  Attorney Wade testified that he had not been involved in any efforts by the defendant or

others to provide cooperation in any unrelated investigations.  Tr. 69.

###   C.    The Sentencing Hearing

Despite the fact that the Chuangs' cooperation did not progress beyond these initial

meetings, Attorney McGuigan believed that it benefited the defendant.  Tr. 34.  Prior to

sentencing on February 8, 2005, the defense filed a sealed motion with the Court outlining these

events [doc. #62], and the Government filed no objection.  Tr. 35, 42.  Although the Government

declined to file a § 5K1.1 motion because it was not going to use the information provided, Tr.

35, it nevertheless agreed with Attorney McGuigan that the defendant's efforts "should be taken

into consideration" by the Court at sentencing.  Tr. 47.  Attorney McGuigan testified that he was

aware at the time of sentencing that he could have filed a motion with the Court, claiming that

the Government had acted in bad faith in declining to file a § 5K1.1 motion.  He did not make

such a motion because "[a]t the time of the sentencing in the case I had no reason to believe that

there was any bad faith on behalf of the Government."  Tr. 44.[1]  Attorney McGuigan was aware

---

[1]Without any citation to the hearing transcript, the defendant claims that Attorney
McGuigan "was not thoroughly familiar with the extent of the cooperation provided by Lily
Chuang and knew very little about the facts of the investigation and its target."  Def. Post-
Hearing Br. at 3 n.1.  The first half of this statement is quite wrong.  As Attorney McGuigan
testified, the cooperation process began with a detailed attorney proffer *that he himself provided*
to the Government after obtaining it from the defendant and his wife.  Tr. 26-28.  Although
Attorney McGuigan did not personally attend the two proffer sessions with the defendant's wife,
he "doubt[ed] there was a lot more information she had than we gave them about."  Tr. 28.

The second half of the statement, on the other hand, is both true and beside the point.  In
nearly all cases, an attorney's knowledge regarding the target is – and ought to be – limited to
what his client knows.  The prosecution makes a point of *not* disclosing additional information,

that this was a post-*Booker* sentencing, and that the Court "could have taken any action it wished with regard to the information" that was filed.  Tr. 48.

In conformity with the parties' agreement, the Court did, in fact, consider this information at sentencing.  In fact, the Court stated in open court that it had considered the defendant's filing regarding his assistance in the investigation of an unrelated criminal matter and "although there are no formal motions with respect to this, the record may reflect that the Court in sentencing Dr. Chuang will do so at the bottom of the applicable guideline range."  Tr. 47.  The Court ultimately held that the defendant's guideline range was 33-41 months.  The Court declined to exercise its discretion to depart downward, and sentenced the defendant to a term of 33 months of imprisonment, followed by two years of supervised release, restitution of $4,210,450.55, and a total of $300 in special assessments.  The defendant never appealed his conviction or sentence.

## III.    Counsel Was Not Ineffective for Failing to "Negotiate a Cooperation Agreement"

In his post-hearing brief, the defendant has broadened his claim of ineffective assistance of counsel.  In his original filing, he claimed only that counsel was ineffective for "fail[ing] to include a cooperation provision in the plea agreement."  Doc. #2 at 6.  Now, he claims that counsel was ineffective both (a) because he "did not negotiate a cooperation agreement on his behalf *at the time of the plea agreement*" and (b) because he "did not negotiate a cooperation agreement *at any time during the course of the cooperation* offered by Frank and Lily Chuang." Petitioner's Post Hearing Brief [doc. #23] at 1 (emphasis added).  Each claim fails for a number of reasons.

---

to ensure that the client can testify strictly from his or her own personal knowledge.

12

A.    **Counsel Was Not Ineffective for Failing to "Negotiate a Cooperation Agreement . . . at the Time of the Plea Agreement"**

For three reasons, under either the performance or prejudice prong of *Strickland v. Washington*, 466 U.S. 668 (1984), counsel was not ineffective for failing to "negotiate" a cooperation agreement with the Government at the time of the plea agreement.

First, the undisputed evidence is that counsel actively explored the possibility of cooperation with both his client and the Government prior to entering into the plea agreement, and there was no factual basis for doing so at the time. *See, e.g.,* Tr. 23. The evidence was undisputed that the subject matter of the attempted cooperation by the defendant and his wife arose from a real estate closing that occurred *after* the plea hearing. Indeed, Attorney McGuigan testified that the issue came to the attention of both the Government and the defense in approximately May 2004. Tr. 10, 24. As Attorney McGuigan testified, he had substantial experience negotiating cooperation agreements in this District, Tr. 19-20, 37-38, 40, and the normal process for doing so begins with an evaluation of what information can be provided by the defendant. Tr. 39. Having received no such information from his client, despite diligent inquiries, Tr. 23, defense counsel can hardly be faulted for failing to convince the Government to proceed to the next steps – an attorney proffer or witness proffer, much less the ultimate conclusion of a cooperation agreement. Indeed, this is particularly true for purposes of the Sixth Amendment, where the only evidence in the record is that Attorney McGuigan followed precisely the same negotiating process that occurs in the relevant jurisdiction (here, the District of Connecticut), when a defendant seeks to cooperate with the Government. Accordingly, the defendant has failed to satisfy the first, or deficient-performance, prong of *Strickland.*

Second, the defendant consistently glosses over the fact that a cooperation agreement is a contract with the Government, and that defense counsel alone has no power to compel the Government to enter into such an agreement. *See* Tr. 23 (Attorney McGuigan: "I couldn't control whether or not the Government would give me a contract."), 46 ("I certainly couldn't make them do it"). Quite to the contrary, Attorneys Wade and McGuigan consistently testified that they were not negotiating from a position of strength, Tr. 23-25, 27-28, 30, 46, particularly given the substantial evidence against their client in the underlying case. Tr. 66. Coupled with the defendant's inability to present the United States with any proposed topic of cooperation that existed prior to the plea hearing, defense counsel's performance cannot be found wanting simply because the United States followed longstanding policy and refused to blindly enter into a open-ended cooperation agreement. Regardless of how many times the defendant repeats that counsel should have been more "vigorous" in seeking a cooperation agreement, the fact remains that he has identified no concrete course of action that counsel failed to take. This is an independent reason why he has failed to satisfy the first prong of *Strickland*.

Third, the defendant failed to offer any evidence that he was even remotely prejudiced by the absence of a cooperation agreement. As this Court recognized in its written ruling in this case, "[g]iven the dearth of factual allegations supporting Chuang's assertion that his cooperation constituted 'substantial assistance' and the affidavits that state the opposite, the court cannot find that Chuang's assistance was substantial." Ruling [doc. #12] at 5. Despite having been afforded an evidentiary hearing to supplement his bald assertions, the defendant has still offered no evidence regarding the supposed utility of the information provided by his wife. As noted above, the Government represented to the Court that it had not, in fact, used the information provided by

14

the Chuangs in proceedings that went forward in the other jurisdiction, or even used the information to obtain a search warrant.  Tr. 11.

The defendant's own witnesses did not contradict the Government's representations in any way.  Attorney Keefe testified that he had no personal knowledge as to what use was made of the information provided by the defendant's wife.  Tr. 63.  Attorney McGuigan agreed that neither the defendant nor his wife had performed any of the usual tasks of a cooperating witness – that is, testifying before a grand jury or trial jury, or making consensual recordings. Tr. 39-40, 42.  Attorney Wade was not involved at all in the efforts to cooperate, Tr. 69, and the defendant's wife did not claim to have any knowledge as to whether the Government had used her information.  Indeed, both Attorney McGuigan and the defendant's wife testified about the Government's lack of interest in asking her to pursue possible further contacts with the putative target of the other investigation.  Tr. 29-32, 76-77.  In short, because the information provided by the Chuangs did not substantially assist the Government in the investigation or prosecution of any third party, the defendant has failed to show his eligibility for a downward departure motion under U.S.S.G. § 5K1.1 – much less has he made the much more difficult showing that the Government somehow acted in bad faith in declining to file such a motion on his behalf.  *See United States v. Reeves*, 296 F.3d 113, 116 (2d Cir. 2002) ("To meet its obligation of good faith, the government need only demonstrate honest dissatisfaction with the defendant's efforts."). Given this baseline fact, a cooperation agreement would have made no difference to his sentence.

The defendant claims that he was prejudiced in two different ways by the lack of a cooperation agreement, but each argument stretches the concept of "reasonable probability" of a different outcome beyond its limits.  First, he randomly speculates that if he had a cooperation

15

agreement and simply "made a claim of bad faith," the Government might have filed a § 5K1.1

motion.  Def. Post-Hearing Br. at 2.  This claim depends, of course, on the wholly unrealistic

notion that the Government would have been cowed by the bare prospect of litigation into filing

a motion which it believed to be meritless.  For good or for ill, the Government is all too

accustomed to filing lengthy responses (like this one) to meritless claims.  Second, he claims

that, had there been a cooperation agreement, he could have forced the Government to articulate

the facts surrounding his cooperation, and this would have prompted an evidentiary hearing.

*Id.* at 2-3.  Yet it is hard to see how the defendant could have benefitted from the Government

describing in detail, at sentencing, why the defendant's information had not been of any use.

Quite the contrary: The defendant appears to have benefitted substantially from the wise course

followed by his counsel at sentencing, of filing a sealed document focusing on the defendant's

*efforts* to cooperate (rather than the slim *results* of that cooperation), since the Court announced

on the record that it was sentencing the defendant to the bottom of the applicable guideline range

in recognition of those efforts.  *See* 2/28/05 Tr. at 37.  And in any event, the defendant could not

have triggered a hearing, because he would have been required to "make a showing of bad faith"

that rose beyond bald allegations.  *See United States v. Roe*, 445 F.3d 202, 210 (2d Cir. 2006)

(holding that defendant made such a showing only after introducing evidence that government

had been aware, prior to entering cooperation agreement, of facts that it later relied upon to deny

§ 5K1.1 motion); *United States v. Knights*, 968 F.2d 1483, 1487 (2d Cir. 1992).  Given the

defendant's continuing failure – even after a hearing – to controvert the fact that his cooperation

was *not* of substantial assistance to the Government, he clearly would not have been able to make

such a showing.

**B.**    **Counsel Was Not Ineffective For Failing to "Negotiate" a Cooperation Agreement After the Plea Hearing.**

As noted above, the defendant argues for the first time in his post-hearing brief that counsel was ineffective for failing to "negotiate" a cooperation agreement between the time of plea and sentencing.  This claim fails for a number of reasons.

First, the claim is barred by the appellate waiver contained in his plea agreement.  This Court, in its earlier ruling, already held that this waiver was enforceable, and accordingly rejected the defendant's attempt to challenge the post-plea actions of his lawyers at sentencing.  *See* Ruling at 6-7 (rejecting claim that lawyers should have moved for downward departure based on claim of extraordinary acceptance of responsibility).  Because the Government has already established "the constitutionality of the process by which the plea agreement was consummated" – that is, it has demonstrated why the defendant has failed to meet his burden of proving that counsel was ineffective in failing to include a cooperation agreement as part of his plea agreement – his waiver is enforceable as to any other "issues that fall within the scope of that waiver" – for example, sentencing claims.  *United States v. Hernandez*, 242 F.3d 110, 113-14 (2d Cir. 2001) (per curiam).  And because the appellate waiver precludes the defendant from raising any challenges to his sentence that are not related to the validity of his plea, *see United States v. Granik*, 386 F.3d 404, 411 (2d. Cir. 2004); *United States v. Morgan*, 386 F.3d 376, 378-79 (2d Cir. 2004), *cert. denied*, 125 S. Ct. 1354 (2005), *aff'd on reconsideration*, 406 F.3d 135 (2d Cir. 2005), *cert. denied*, 126 S. Ct. 549 (2005), he is barred from challenging his attorneys' performance in negotiating cooperation in the post-plea stages of his case.

Second, even if the Court could reach this claim, it is meritless.  As the Government

17

pointed out in Part III.A above, Attorney McGuigan's performance was exemplary, not deficient. As his testimony demonstrates, he engaged in a lengthy, albeit unsuccessful, effort to obtain a § 5K1.1 motion for his client. His efforts led to an attorney proffer with the Government; a meeting with the Government that his client attended; and two proffers which the defendant's wife attended, along with her separate counsel. In other words, he convinced the Government to take all the preliminary steps that could be taken to enable the Government to evaluate the utility of the proffered information. He cannot be faulted simply because the Government did not find the Chuangs' information to be particularly useful. Moreover, for the same reasons outlined in Part III.A, the defendant has failed to demonstrate prejudice under the second prong of *Strickland*: Because the defendant has not contradicted the Government's evidence that this information was not useful, he cannot show that a cooperation agreement would have made any difference.

**IV.    <u>Conclusion</u>**

Resolution of this case should be a simple matter. As to pre-plea matters, the defendant had no information to offer the Government, and so defense counsel cannot be faulted for not having convinced the Government to enter blindly into a cooperation agreement at that point. (Indeed, to fault defense counsel in this case would necessarily imply that most defense lawyers in Connecticut regularly perform deficiently under the first prong of *Strickland*, since the vast majority of pleas in this District do not involve cooperation agreements.) As to the post-plea performance of his attorneys, the defendant validly bargained away his right to raise any such challenges – including this sentencing claim – when he agreed to waive his right to appeal or collaterally attack his sentence.

For all the reasons set forth above and in the Government's earlier filing [doc. #7], it respectfully requests that the Court deny the defendant's Motion to Vacate.  Finally, in the interests of judicial efficiency, the Government respectfully requests that the Court also simultaneously deny any Certificate of Appealability for failure to make a substantial showing of the denial of a constitutional right, 28 U.S.C. § 2253(c)(3).

                                        Respectfully submitted,

                                        KEVIN J. O'CONNOR
                                        UNITED STATES ATTORNEY


                        by:     JOHN A. DANAHER III
                                ASSISTANT U.S. ATTORNEY
                                Federal Bar No. CT05101

                        for:    WILLIAM J. NARDINI
                                ASSISTANT U.S. ATTORNEY
                                Federal Bar No. CT16012
                                157 Church Street, 23rd Floor
                                New Haven, CT  06510
                                Tel.: (203) 821-3748
                                Fax: (203) 773-5377
                                william.nardini@usdoj.gov

19

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 13th day of November 2006, a true and correct copy of the foregoing Motion was served via fax upon defense counsel:

Cheryl J. Sturm                                      cc: trial counsel
Attorney-at-law
387 Ring Road                                        Austin J. McGuigan, Esq.
Chadds Ford, PA 19317                                Glenn Coe, Esq.
                                                     Rome McGuigan Sabanosh PC
                                                     One State Street
                                                     Hartford, CT 06103-3101

                                                     James Wade, Esq.
                                                     Robinson & Cole LLP
                                                     One Commercial Plaza
                                                     280 Trumbull Street
                                                     Hartford, Ct 06103-3597


_____
JOHN A. DANAHER III
for WILLIAM J. NARDINI
ASSISTANT U.S. ATTORNEYS

20